19-3623 (L)
*United States v. Dawkins, Code*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2020
Nos. 19-3623 (L) and 19-3643 (Con)

UNITED STATES OF AMERICA,
*Appellee,*

*v.*

CHRISTIAN DAWKINS, MERL CODE,
*Defendants-Appellants,*

LAMONT EVANS, EMANUEL RICHARDSON, ANTHONY BLAND,
*Defendants.*[1]

Appeal from the United States District Court
for the Southern District of New York
Nos. 17-cr-684-4 and 17-cr-684-5 — Edgardo Ramos, *Judge*

ARGUED: OCTOBER 22, 2020
DECIDED: JUNE 4, 2021

Before: RAGGI, SULLIVAN, and NARDINI, *Circuit Judges.*

[1] The Clerk of Court is directed to amend the caption as set forth above.

On appeal from conspiratorial and substantive bribery convictions in the United States District Court for the Southern District of New York (Edgardo Ramos, *J.*), *see* 18 U.S.C. §§ 371, 666(a)(2), the defendants argue that § 666(a)(2) does not cover their scheme to bribe college basketball coaches and is unconstitutional as applied to them. They maintain that § 666 requires a nexus between the "agent" to be influenced or rewarded and the federal funds received by their organization, and that the "business" of a federally funded organization, to which the bribery scheme is connected, must be commercial in nature. Additionally, they argue that various evidentiary and instructional rulings were erroneous and warrant vacatur of their convictions. **AFFIRMED**.

---

DAVID ALLEN CHANEY, JR., Chaney Legal Services, LLC, Greenville, SC, (Steven A. Haney, Haney Law Group PLLC, Southfield, MI, *on the brief*), *for Defendants-Appellants*

ROBERT L. BOONE, Assistant United States Attorney (Eli J. Mark, Noah D. Solowiejczyk, Thomas McKay, Assistant United States Attorneys, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*

---

WILLIAM J. NARDINI, *Circuit Judge*:

Defendants-Appellants Christian Dawkins and Merl Code stand convicted by a jury of conspiracy to commit bribery in violation of 18 U.S.C. §§ 371 and 666(a)(2). Dawkins also stands convicted of substantive bribery in violation of § 666(a)(2). The defendants here appeal their convictions, entered on October 22, 2019, in the United States District Court for the Southern District of New York (Edgardo Ramos, *J.*). They argue that § 666(a)(2) does not cover their charged scheme to bribe college basketball coaches and is unconstitutional as applied to them. Specifically, they maintain that § 666 requires a nexus between the "agent" to be influenced or rewarded and the federal funds received by their organization, and that the "business" of a federally funded organization, to which the bribery scheme is connected, must be commercial in nature. Additionally, they argue that various evidentiary and instructional rulings were erroneous and warrant vacatur of their convictions. We are unpersuaded by these arguments.

In 18 U.S.C. § 666, Congress used broad terms to prohibit bribery in relation to federally funded programs. As relevant here, the statute prohibits certain

actions taken "with intent to influence or reward an agent" of a designated recipient of federal funds, "in connection with any business" of that recipient. The defendants ask us to shorten the reach of 18 U.S.C. § 666(a)(2), limiting the universe of "agents" to be influenced and "businesses" involved. But it is not the role of courts to engraft restrictive language onto statutes. Nor should we cabin a law that Congress wrote expansively to preserve the integrity of organizations that receive federal dollars. Today, we follow the logical course charted by longstanding precedent to reach two conclusions with respect to 18 U.S.C. § 666(a)(2): first, the "agent" of a federally funded organization need not have control over the federal funds, and the agent need not work in a specific program within the organization that uses those federal dollars; and second, the "business" of a federally funded organization need not be commercial in nature. With respect to the defendants' other challenges on appeal, we identify no reversible error. Accordingly, we affirm the judgments of conviction.

4

## I. Overview

On March 7, 2019, a grand jury returned a Superseding Indictment, charging Dawkins and Code with conspiracy to commit bribery,[2] *see* 18 U.S.C. §§ 371, 666(a)(2) (Count One); substantive bribery, *see id.* §§ 666(a)(2), 2 (Count Two); conspiracy to commit honest services wire fraud, *see id.* §§ 1343, 1346, 1349 (Count Three); and conspiracy to commit Travel Act bribery, *see id.* §§ 371, 1952(a)(1) & (a)(3) (Count Six). Dawkins was also individually charged with two substantive counts of honest services wire fraud. *See id.* §§ 1343, 1346, 1349, 2 (Counts Four and Five).

The indictment alleged a straightforward scheme: Dawkins and Code planned to pay bribes to basketball coaches at National Collegiate Athletic

---

[2] Counts One and Two charged both bribery and gratuity theories under § 666(a)(2), alleging intent to influence and to reward agents of a federally funded organization. *See United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999) ("Bribery requires intent 'to influence' . . . , while illegal gratuity requires only that the gratuity be given or accepted 'for or because of' an . . . act. In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an . . . act. An illegal gratuity, on the other hand, may constitute merely a reward for some future [or past] act . . . ." (discussing 18 U.S.C. § 201(b) and (c))). The district court instructed the jury on both theories, and the jury returned general verdicts of guilt against both defendants on Count One and a general verdict of guilt against Dawkins on Count Two. But because the parties phrase their arguments on appeal solely in terms of bribery, for the sake of convenience, our opinion does so as well.

Association ("NCAA") Division I universities in exchange for the coaches' agreement to steer their student-athletes toward Dawkins's sports management company after leaving college and becoming professional basketball players.

The defendants moved to dismiss the indictment before trial, challenging Counts One and Two on the ground that the Government's allegations failed to establish two elements of a § 666(a)(2) violation: (1) that the persons intended to be influenced or rewarded (here basketball coaches) were "agents" of federally funded organizations, and (2) that the scheme to influence or reward was "in connection with any business" of these organizations. 18 U.S.C. § 666(a)(2). Upon consideration of the same arguments pursued by the defendants on their appeal, the district court orally denied the motion, and the case proceeded to a two-week trial.

On May 8, 2019, the jury found Dawkins guilty on Counts One and Two, and Code guilty on Count One. The jury acquitted the defendants of the remaining charges. After the verdict, the district court issued a written opinion explaining its earlier denial of the motion to dismiss. *See* Doc. No. 244, Dkt. No. 17-cr-684. It then

sentenced Dawkins principally to a year and a day in prison, and Code to three months in prison. Both defendants now appeal their convictions.

## II. The bribery scheme

Viewed in the light most favorable to the jury's verdict,[3] the trial evidence showed the following.

Christian Dawkins formerly worked as a "runner," a liaison who helps sports agents develop professional relationships with athletes. In September 2015, Dawkins became acquainted with Louis Martin Blazer, a financial and business manager who had once worked primarily for NFL players. To develop relationships with potential future clients, Blazer had at times paid college football players in hopes that they would retain his services once they turned pro. Unbeknownst to Dawkins, Blazer was cooperating with Government investigators, who recorded the men's conversations.

In December 2015, Dawkins proposed that Blazer give Dawkins money to pay basketball players whom Dawkins was attempting to recruit. In exchange,

---

[3] *See United States v. Thompson*, 896 F.3d 155, 159 (2d Cir. 2018).

Dawkins would refer the players to Blazer for financial management services. Dawkins also proposed that Blazer take over payments Dawkins had been making to University of South Carolina assistant basketball coach Lamont Evans,[4] who, in return, was to steer his players to retain Dawkins's then-employer, a sports management agency, when they went pro. Dawkins proposed that Blazer develop a relationship with Evans, who could refer his players to Blazer for financial advice and management. Blazer, at the Government's direction, agreed to take over the payments.

Around this time, Blazer introduced Dawkins to Munish Sood, an investment manager, who, with Blazer, took over the payments to Evans. In March 2016, Dawkins, Blazer, Sood, and Evans met and discussed recruiting and paying players as well as the value of building relationships with assistant coaches. Dawkins later explained to Blazer and Sood that paying coaches was advantageous, since coaches could refer still other players if an initial referral did not work out, and they could limit other potential agents' and advisors' access to

---

[4] Evans later became an assistant basketball coach at Oklahoma State University.

8

their players. In exchange for the bribes Blazer and Sood began to pay, Evans introduced them to one player and to another player's mother. During trial, Blazer and Sood testified extensively about their understandings of these recorded conversations.

In June 2017, Dawkins, Sood, and "Jeff D'Angelo," an undercover FBI agent posing as a wealthy businessman, formed a sports management company, LOYD, Inc. ("LOYD"). The plan was for LOYD to develop relationships with college basketball coaches, who would in turn refer players to LOYD for sports management services upon turning pro.

Later in June 2017, two recorded meetings relevant to this appeal occurred in New York. First, Sood and D'Angelo met with University of Arizona assistant basketball coach Emanuel "Book" Richardson to discuss buying access to Richardson's players. At the close of the meeting, D'Angelo handed Richardson five thousand dollars. Second, immediately after the Richardson meeting, Dawkins, Blazer, Sood, and D'Angelo met with Merl Code—a consultant for Adidas, a major sports apparel company—who had extensive relationships with

basketball coaches and players. The purpose of this meeting was to see whether Code could help LOYD generate business by introducing the LOYD group to his basketball contacts. At the end of this meeting, D'Angelo gave Code two thousand dollars.

In July 2017, Dawkins, Blazer, and D'Angelo met ten college coaches in Las Vegas and paid some of them bribes of up to $13,000. Although Code was not present for these meetings, he helped arrange them and advised the LOYD group on how to talk with the coaches; in particular, he warned that the coaches would likely be wary of accepting money from people they did not yet trust. After these meetings, some coaches began to fulfill their end of the bribery bargain by introducing the LOYD group to players' families. Shortly thereafter, Dawkins and Code were arrested.[5]

---

[5] In a separate trial arising from this series of events and others related to it, Dawkins and Code were convicted of wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349, for "engaging in a scheme to defraud three universities by paying tens of thousands of dollars to the families of high school basketball players to induce them to attend the universities . . . and covering up the payments so that the recruits could certify to the universities that they had complied with [NCAA rules] barring student-athletes and recruits from being paid." *United States v. Gatto*, 986 F.3d 104, 109–10 (2d Cir. 2021).

## III.   The defendants' challenges under 18 U.S.C. § 666(a)(2)

The defendants' primary argument on appeal is that the district court misconstrued § 666(a)(2) in recognizing the basketball coaches in this case as "agents" of their federally funded university employers and in concluding that the defendants' bribery efforts were connected to the "business" of those universities. They frame the argument primarily as a challenge to the district court's denial of their pretrial motion to dismiss the indictment. They also rely on it to maintain that the district court should have applied a narrower construction of § 666(a)(2) (presumably when instructing the jury), and that the Government failed to prove its case under the defense's proffered interpretation of the statute. As we have explained, "the pleading standard for an indictment is entirely separate from the evidentiary standard at trial,"[6] and is different yet again from the question of whether the jury was properly instructed. We therefore address the pleading question first, and then turn to the trial questions.

---

[6] *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021).

## A. The Superseding Indictment properly alleged a violation of 18 U.S.C. § 666(a)(2).

We find no error in the district court's denial of the defendants' motion to dismiss the Superseding Indictment, which we review *de novo*.[7] "An indictment is sufficient as long as it (1) 'contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend,' and (2) 'enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"[8] To satisfy these requirements, "an indictment need do little more than . . . track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."[9] Here, Counts One and Two used the same words as § 666(a)(2) to charge the defendants with trying to influence an agent of a federally funded organization. Moreover, the Superseding Indictment was a "speaking indictment" that provided significant detail about the

---

[7] *See United States v. Canori*, 737 F.3d 181, 182 (2d Cir. 2013).

[8] *Wedd*, 993 F.3d at 120 (alteration omitted) (quoting *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998)).

[9] *Id*. (quoting *Alfonso*, 143 F.3d at 776).

factual nature of the charges. This was more than enough background to inform

the defendants of when and where the offense conduct took place. Therefore, the

Superseding Indictment was sufficient.

The defendants argue that the district court should have gone further and

weighed whether certain factual allegations in the Superseding Indictment—

specifically that the coaches were "agents" of the universities and that the bribery

scheme was "in connection" with the universities' "business" of running an

athletic program—were consistent with the charged violations. The defendants

interpret § 666(a)(2) to require additional showings for someone to be an "agent,"

and for activities to be part of a university's "business." But "[a]t the indictment

stage, we do not evaluate the adequacy of the facts to satisfy the elements of the

charged offense. That is something we do after trial."[10] Otherwise, we would

effectively be asking district courts to engage in summary judgment

---

[10] *Id*. at 121. The only exception that might apply to this general rule is when the Government has made "a full proffer of the evidence it intends to present at trial." *Id*. (quoting *Alfonso*, 143 F.3d at 776). The defendants do not claim that such a full proffer took place in this case.

proceedings—something that "does not exist in federal criminal procedure."[11] Thus, the district court correctly denied the defendants' motion to dismiss the Superseding Indictment.

## B. The Government proved a violation of § 666(a)(2).

The defendants also argue, in the alternative, that the district court should have applied their proposed narrower definitions of "agent" and "business"—a claim that we read as a challenge both to the jury instructions and to the sufficiency of the evidence. These arguments turn largely on the same grounds: (1) that the coaches were not in fact "agents" of the universities under § 666(a)(2) because they did not control spending of federal funds at the universities or work in a program within the university that used those funds, and (2) that the bribery scheme was not "in connection" with the universities' "business," the meaning of which should be limited to the universities' commercial activities.

---

[11] *Id*. (quoting *United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018)).

The defendants did not preserve these arguments before the district court,[12]

and so their challenges would appear to be reviewable only for plain error.[13] Our

standard of review is immaterial, however, because we discern no error at all.

> **1. 18 U.S.C. § 666(a)(2) does not require a nexus between the "agent" of a federally funded organization and the federal funds the organization receives.**

Section 666(a)(2) broadly prohibits conduct designed to improperly

influence or reward the agents of certain federally funded organizations. In

relevant part, the statute provides:

---

[12] Although the defendants moved for judgments of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, they did not challenge the sufficiency of the evidence with respect to either of these points. Likewise, the defendants did not propose jury instructions that embodied their reading of § 666(a)(2), nor did they object to the court's jury instructions on these elements.

[13] *See* Fed. R. Crim. P. 30(d) ("A party who objects to any portion of the [jury] instructions . . . must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. . . . Failure to object in accordance with this rule precludes appellate review, except [where there was plain error]."); *see also* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."); *United States v. Dussard*, 967 F.3d 149, 155 (2d Cir. 2020) ("The requirements for obtaining relief on plain-error review are well established. Under Rule 52(b), before an appellate court can correct an error not raised in the district court, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." (internal quotation marks and alterations omitted)), *cert. denied*, No. 20-6743 (May 17, 2021) (mem.).

> Whoever . . . corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more[] shall be fined under this title, imprisoned not more than 10 years, or both[,] . . . [provided that] the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

To determine whether a target of corrupt "influence or reward" is an "agent" for purposes of § 666(a)(2), we "necessarily begin[] with the plain meaning of [the] law's text and, absent ambiguity, will . . . end there."[14] Section 666(d)(1) defines an "agent" as "a person authorized to act on behalf of another person . . . and, in the case of an organization . . . , includes a servant or employee, and a partner, director, officer, manager, and representative." The district court adhered to this statutory definition in charging the jury on the agency element of a § 666 violation, instructing:

---

[14] *United States v. Ng Lap Seng*, 934 F.3d 110, 122 (2d Cir. 2019) (internal quotation marks omitted), *cert. denied*, 141 S. Ct. 161 (2020).

16

The fourth element the government must prove beyond a reasonable doubt is that at the time alleged in the indictment, in or about 2016 to in or about 2017, any men's college basketball coach who received a payment from, or as facilitated by, the defendant you are considering was, in fact, an agent of the university that employed him. *An agent is a person who is authorized to act on behalf of his organization. Employees are considered agents of the organizations that employ[] them.*[15]

The italicized language of the jury charge closely tracked the language of the statute, both identifying that an agent must be "authorized to act on behalf" of the organization, and explaining that an "employee" falls within the list of statutorily enumerated types of agents. Because the charge accurately tracked the statute, it was not erroneous.

Dawkins and Code do not contest that a straightforward reading of the statute leads to this conclusion. Rather, they argue that we should disregard the plain language of § 666 and instead impose a narrowing construction to avoid "stretch[ing the statute] well beyond its stated purpose."[16] Otherwise, the

---

[15] Tr. at 1615 (emphasis added).

[16] Appellants' Br. at 39.

defendants assert, the term "agent" would sweep so broadly as to include employees such as "part-time janitor[s]" whose roles are not connected to "protecting the integrity of federal funds."[17] The defendants argue that § 666 "agents" are only those who can access or direct the spending of federal funds, or at least are associated with a division of the university that receives federal funds. But it is not our place to limit language enacted by Congress in order to pursue the policy goals posited by the defendants.[18]

We do not write on a blank slate in reaching this conclusion. The Supreme Court has twice rejected similar attempts to engraft an extratextual "nexus" requirement onto § 666. Most recently, in *Sabri v. United States*, the Court rejected

---

[17] *Id.*

[18] *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020) ("[O]nly the words on the page constitute the law adopted by Congress and approved by the President. If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives."); *Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019) ("It is a fundamental principle of statutory interpretation that 'absent provisions cannot be supplied by the courts.'" (internal alteration omitted) (quoting A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 94 (2012))); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

the related argument that the statute requires "a nexus between the bribery proscribed . . . and federal funding" to be a valid exercise of Congress's authority under Article I.[19] The Court reasoned that the federal funds did not have to be directly affected by the bribery scheme because "corruption does not have to be that limited to affect the federal interest. Money is fungible . . . and corrupt contractors do not deliver dollar-for-dollar value."[20] Even if university employees like the basketball coaches in this case might not directly spend, misuse, or "fritter[] away" federal dollars,[21] they nevertheless "pose[] a threat to the integrity of the [federally funded] entity, which in turn poses a threat to the federal funds entrusted to that entity."[22] In reaching this conclusion, *Sabri* built on the Court's earlier decision in *Salinas v. United States*, which held that the adjacent and nearly

---

[19] *Ng Lap Seng*, 934 F.3d at 138 (citing *Sabri v. United States*, 541 U.S. 600, 605–06 (2004)).

[20] *Sabri*, 541 U.S. at 606.

[21] *Id*. at 605.

[22] *United States v. Fernandez*, 722 F.3d 1, 11 (1st Cir. 2013) (internal quotation marks omitted); *see also United States v. Keen*, 676 F.3d 981, 990 (11th Cir. 2012) ("[E]ven if these thieves and cheats are not specifically using their positions to defraud the entity employing them, it cannot be denied that their fraudulent conduct poses a threat to the integrity of the entity, which in turn poses a threat to the federal funds entrusted to that entity.").

identical provision in § 666(a)(1)(B) prohibiting solicitation of bribes "does not require the Government to prove the bribe in question had any particular influence on federal funds."[23] We are mindful that *Sabri* abrogated our holding in *United States v. Santopietro,* which maintained—even after *Salinas*—that "at least some connection [was required] between the bribe and a risk to the integrity of the federal funded program."[24] It is now clear that *Santopietro* was a wrong turn, corrected by *Sabri*, and we will not venture down that road again.

Dawkins and Code encourage us to look not to *Sabri*, *Salinas*, and sister-circuit cases that align with them,[25] but instead to the Fifth Circuit's ruling in *United States v. Phillips* for the proposition that an agent must have control over the expenditure of federal funds to fall within the scope of § 666(a)(2).[26] In *Phillips*, the Fifth Circuit addressed the question of whether the defendant—a corrupt tax

---

[23] 522 U.S. 52, 61 (1997).

[24] 166 F.3d 88, 93 (2d Cir. 1999); *see Sabri*, 541 U.S. at 604.

[25] *See Fernandez*, 722 F.3d at 11; *Keen*, 676 F.3d at 990.

[26] 219 F.3d 404, 415 (5th Cir. 2000) ("[T]he statutory term 'agent' . . . should be construed . . . to tie the agency relationship to the authority that a defendant has with respect to control and expenditure of the funds of an entity that receives federal monies.").

assessor for a Louisiana parish that received federal funds in the form of food stamps for parish residents—qualified as an "agent" of the parish for the purposes of § 666. The court held that he did not, because he was neither an employee nor an officer of the parish, and because "he was not authorized to act on behalf of the parish with respect to its funds."[27] Here, unlike *Phillips*, the coaches *are* employees of the universities. Additionally, to the extent *Phillips* required the defendant to have authority over federal funds, it is inconsistent with the Supreme Court's later holding in *Sabri* that § 666(a)(2) does not require a nexus between the bribery and the federal funding. Indeed, the Fifth Circuit itself has since "suggested that a broader definition of 'agent' is more faithful to the statutory text and purpose and to [the Fifth Circuit's] earlier decisions addressing § 666."[28]

---

[27] *Id*. at 413.

[28] *United States v. Shoemaker*, 746 F.3d 614, 622 n.7 (5th Cir. 2014); *see also id.* ("*Phillips* added 'extra-textual teeth' to the 'agent' definition by requiring the agent to have power over the organization's funds . . . ." (quoting *United States v. Lipscomb*, 299 F.3d 303, 313 (5th Cir. 2002))).

Similarly unpersuasive is the defendants' reliance on *United States v. Sunia*[29] to support their argument that the coaches are not agents of federally funded organizations because the universities' athletic programs—as opposed to the universities as a whole—do not receive federal funding. In *Sunia*, the U.S. District Court for the District of Columbia considered whether the defendants, who were employees of the legislative branch of the American Samoa government, were "agents" for the purposes of § 666(a)(1)(A), where it was the *executive* branch of the American Samoa government that received the federal funds giving rise to the indictment. The Government argued that § 666(a) applied to the defendants because they were agents of the American Samoa government more generally. Relying on *Phillips*, the district court rejected this argument, holding that the statute required the defendants to be agents of the particular government agency receiving the federal funds.[30]

---

[29] 643 F. Supp. 2d 51 (D.D.C. 2009).

[30] *Id.* at 63–64.

*Sunia* is not helpful to the defendants. First, Dawkins and Code fail to explain why, for the purposes of § 666, we can slice up a university's various programs—say, distinguishing its athletic programs from its academic programs—when what the statute requires is that the "organization" receive federal funding, not that a particular department or program of that organization do so.[31] In other statutes, such as Section 504 of the Rehabilitation Act, Congress has demonstrated its ability to differentiate more finely between whole organizations or governments on the one hand, and a specific "program or activity" on the other.[32] We must therefore give effect to Congress's choice not to delineate matters so finely in § 666 when speaking of an "organization" rather than a subset of that organization or its activities.

Second, *Sunia* did not concern § 666(d)(1)'s definition of an "agent." Rather, the district court's focus was on § 666(d)(2), which defines the statute's coverage

---

[31] *See* 18 U.S.C. § 666(b).

[32] *See T.W. v. N.Y. State Bd. of L. Examiners*, 996 F.3d 87, 92–95 (2d Cir. 2021) (considering the scope of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), which provides immunity from suit to an arm of the State unless it is a "program or activity receiving Federal financial assistance").

as extending to government "subdivisions" in holding that "agents" of a "government agency" must work for the particular governmental subdivision that receives federal funds to trigger application of § 666.[33] Even assuming that *Sunia* was correct that § 666(d)(2) requires tying federal funding to a specific "government agency," that holding does not pertain to § 666(d)(1) or call into question that the relevant "organization" under that subsection is the university—including all of its component parts.

In § 666(a)(2), Congress has defined the scope of its efforts to preserve the integrity of federal programs broadly and, as courts, it is not our role to second-guess that legislative judgment and to invent additional requirements that we think might better address the problem.[34] We therefore hold that, in order to prove a violation of § 666(a)(2), the Government need not prove a nexus between the agent to be influenced or rewarded and the federal funding that the relevant

[33] 643 F. Supp. 2d at 62–63.

[34] Indeed, the Supreme Court has explained that the purpose of § 666 is to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery," *Sabri*, 541 U.S. at 606 (quoting S. Rep. No. 98-225, at 370 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3511), and § 666(a)(2) "addresses the problem at the source of bribes," *id*. at 605.

organization receives. Specifically, the Government need not prove that the agent had any control over the federal funding received by the organization, or that the agent worked in a specific program within the organization that used those federal dollars. Accordingly, the district court's jury instruction, which did not so limit the definition of "agent," was not erroneous.

Having confirmed the legal meaning of "agent," we can quickly dispatch the defendants' challenge to the sufficiency of the evidence on this point. The undisputed trial evidence showed that the bribed coaches were employees of their universities throughout the course of the charged § 666 scheme. Employees are agents under § 666(d)(1). Accordingly, we hold that there was sufficient evidence for a rational jury to conclude, beyond a reasonable doubt, that these coaches were agents of their universities.[35]

---

[35] *See United States v. McCoy*, 995 F.3d 32, 61 (2d Cir. 2021) ("In considering a challenge to the sufficiency of the evidence to support a conviction, we view the evidence, whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessments of witness credibility and the weight of the evidence."); *id.* ("[A] conviction will be upheld so long as, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))).

## 2. The bribes paid by the defendants to the university basketball coaches in exchange for influence exerted over student-athletes were "in connection" with a university's "business."

The district court instructed the jury that "the phrase 'business or transaction' is not limited to transactions or to commercial business of the universities, but includes intangible aspects of the business of the organization," and that the "business or transaction" involved in this case was "the operation and administration of the university's men's basketball program."[36] The defendants make two related arguments on this point, one essentially legal and the other essentially factual.

---

[36] Tr. at 1610–11. The full instruction on this element read:

> The business or transaction that the defendant you are considering sought to influence does not have to relate to federal funding. In other words, while you must find that the university that employed the relevant men's basketball coach received more than $10,000 in federal benefits, the defendants need not have paid, offered, or agreed to offer bribes as to any business or transaction having to do with the federal funding. Further, the phrase "business or transaction" is not limited to transactions or to commercial business of the universities, but includes intangible aspects of the business of the organization. . . . Here, the government argues that the defendants offered or agreed to give something of value corruptly with the intent that the men's college basketball coach be influenced or rewarded in connection with some business or transaction of that coach's university, namely, the operation and administration of the university's men's basketball program.

26

First, they argue that the term "business" in § 666(a)(2) must be construed narrowly to include only commercial activity. They contend that defining "business" more broadly to include the running of a university athletic program, as the district court did, would render this element of the law a nullity, because anything could then be a business of a federally funded organization. According to Dawkins and Code, the term "business" must be interpreted to mean commercial activity to ensure that § 666(a)(2) is "consistent[ly] and predictabl[y]" applied.[37] But that construction is at odds with the statute itself.

The Seventh Circuit considered and rejected the same argument in *United States v. Robinson*, holding that the term "business" did not need to be understood in the commercial sense,[38] and we agree with the *Robinson* court's analysis. At issue in that case was whether bribing a police officer to shield the defendant's drug trafficking operations from police scrutiny was in connection with the "business" of law enforcement for the purposes of § 666(a)(2). The defendant argued it was

---

[37] Appellants' Br. at 48.

[38] 663 F.3d 265, 275 (7th Cir. 2011).

not, because such business is not commercial in nature. The Seventh Circuit disagreed for several reasons.

To begin, it concluded that the surrounding language of § 666(a)(2) supports an "expansi[ve]" interpretation of the word "business."[39] The court noted that while the many dictionary definitions of "business" range from narrow to broad, this surrounding language reveals that "the term 'business' has a broader [statutory] meaning."[40] Further, the court recognized that it would contradict the express statutory text for "business" to be limited to commercial activities, because such a limiting interpretation "would have the effect of excluding bribes paid to influence agents of state and local governments," which are explicitly included

---

[39] *Id*. at 273 ("The statute targets bribes solicited or offered . . . 'in connection with *any* business . . . [of a federally funded organization] involving *anything* of value of $5,000 or more.' . . . 'Any' and 'anything' are terms of expansion." (quoting 18 U.S.C. § 666(a)(2))).

[40] *Id.* at 274 & n.4. Indeed, this range of meanings is on display in President Coolidge's oft-quoted (or misquoted) remark: "[T]he chief business of the American people is business." *See* Robert Sobel, *Coolidge and American Business*, Calvin Coolidge Presidential Foundation, https://www.coolidgefoundation.org/resources/essays-papers-addresses-35/ (last visited March 30, 2021). Coolidge's pithy statement captures two common meanings of "business"—the first being a particular field of endeavor, and the second being commercial activity.

within the scope of § 666(a)(2).[41] Finally, the court looked to the purpose of the statute and determined that it supported a broad reading of the term "business," as "[b]ribes paid to influence the intangible, noncommercial business of a federally funded organization threaten to undermine the integrity of those organizations no less than bribes paid to influence . . . commercial-like transaction[s]."[42]

Section 666 is indeed written in expansive terms, and in *Ng Lap Seng* we recognized that the statute "[n]owhere . . . place[s] any definitional limits on the business or transactions to be influenced—beyond requiring them to be 'of' the organization receiving more than $10,000 in federal funding and to have a 'value of $5,000 or more.'"[43] This capacious understanding of the "business" element does not render it a nullity; it allows the statute to do its intended work. It is the defendants' exclusion of noncommercial business from the scope of the statute that would render the statute inoperative in a vast swath of cases. Accordingly, we

---

[41] *Robinson*, 663 F.3d at 274.

[42] *Id.* at 275.

[43] *Ng Lap Seng*, 934 F.3d at 133 (quoting 18 U.S.C. § 666(a)(2) and contrasting its language with "official act" bribery proscribed by 18 U.S.C. § 201(b)(1)(A)).

hold that the district court correctly instructed the jury that, for purposes of § 666(a)(2), "the phrase 'business or transaction' is not limited to transactions or to commercial business of the universities, but includes intangible aspects of the business of the organization."[44]

Second, in what amounts to a challenge to the sufficiency of the evidence, the defendants challenge the characterization of the "business" affected by the scheme to bribe coaches. They argue that, at most, the payments related to recommending financial advisors to basketball players, or to running an NCAA-compliant athletic program—and that neither of those constitutes the "business" of a university under any definition of the term. But that is not how the jury was charged, or how the government presented its case. The court instructed that the business at issue here was "the operation and administration of the university's

_____

[44] Tr. at 1610. Because we conclude that § 666 prohibits bribes in connection with the business of a federally funded organization regardless of its commercial or noncommercial character, we need not consider whether a university athletic program constitutes commercial activity. *Cf. Gatto*, 986 F.3d at 110 ("We have no doubt that a successful men's basketball program is a major source of revenue at certain major universities, but we need not be drawn into the debate over the extent to which college sports is a business.").

men's basketball program."[45] At trial, there was evidence of what that business entailed, including that: the coaches were employed to run those programs; they were expected to advise student-athletes about off-court decisions like selecting agents; they were expected to ensure compliance with NCAA rules; and their employment contracts prohibited them from accepting money from outside advisors to influence student-athletes. The evidence showed that the bribes were in connection with those aspects of the universities' business. That is, Dawkins and Code conspired to bribe (and Dawkins did bribe) coaches to exercise influence over student-athletes—influence they had by virtue of their employment at the universities and positions in the universities' athletic departments—to steer those student-athletes toward particular financial advisors.

The defendants argue that this conclusion means that § 666(a)(2) criminalizes the breaking of private rules, such as those governing NCAA programs. But the district court was careful to instruct the jury that the defendants were not charged with violating NCAA rules. Evidence that NCAA rules were

---

[45] Tr. at 1611.

broken illustrated how the bribery scheme related to university business, and it was also probative of the defendants' corrupt intent. Perhaps the starkest demonstration of the connection between the bribes and the university athletic programs was that the coaches' misconduct put the universities at risk of suffering financial and other penalties imposed by the NCAA, of which the universities were members. But the offense itself remained the bribery—that is, corruptly giving or agreeing to give money to the coaches to influence their actions in connection with university business. Viewed in the light most favorable to the jury's verdict, this evidence established a clear connection between the bribery scheme and the business of the universities, and thus was sufficient to support the bribery convictions.

## IV.    The statute is constitutional as applied to Dawkins and Code.

We review *de novo*, [46] and find no error in, the district court's legal conclusion that § 666(a)(2) is not unconstitutionally vague as interpreted and applied to Dawkins and Code. The void-for-vagueness doctrine requires that "a penal statute

---

[46] *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 252 (2d Cir. 2015).

define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."[47] "Statutes carrying criminal penalties or implicating the exercise of constitutional rights . . . are subject to a more stringent vagueness standard than are civil or economic regulations."[48] However, the statute "need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth."[49]

The defendants argue that § 666 is unconstitutional as applied to them because (1) ordinary people reading its terms would not understand the statute to prohibit paying college coaches to steer their student-athletes to retain certain business advisors; and (2) such a broad prohibition would enable the Government to engage in discriminatory enforcement. We disagree.

---

[47] *Id.* at 265 (internal quotation marks omitted).

[48] *Id.* (internal quotation marks omitted).

[49] *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013) (quoting *Mannix v. Phillips,* 619 F.3d 187, 197 (2d Cir. 2010)).

As we have already discussed, the district court's interpretation of "agent" and "business" was not impermissibly broad or divorced from the anti-bribery statute's intended purpose, which is to safeguard federal funds and the integrity of the institutions that receive them. Section 666(d)(1) expressly defines agents to include employees (like the coaches here), and § 666(a)(2) nowhere suggests that bribes must relate only to particular programs or divisions, within an organization, that benefit from federal funds. Likewise, we have just explained that the term "business" naturally includes both commercial and noncommercial activity. Accordingly, we conclude that ordinary people would understand § 666(a)(2) to proscribe corrupt payments to an employee of a university, which receives federal funds, in order to influence the employee to take action favorable to the bribe-payor in a matter that is connected to the university's business—here, the administration and operation of its athletic program. Dawkins and Code's efforts to construct a wall between the universities and their athletic programs fail to convince us otherwise. And because § 666 specifically prohibits bribery aimed at agents of federally funded organizations, its language "is adequate . . . to avoid

arbitrary enforcement" against Dawkins and Code.[50] We therefore hold that the statute as applied is constitutionally sound.

## V. The district court did not abuse its discretion when making the challenged evidentiary rulings.

We now turn to the defendants' numerous evidentiary challenges, which we find uniformly without merit. Judges are entrusted with considerable discretion when deciding which evidence to admit or exclude at trial.[51] We will reverse for an abuse of discretion only when an evidentiary ruling is "manifestly erroneous"[52] or "arbitrary and irrational."[53] "Either an error of law or a clear error of fact may constitute an abuse of discretion."[54]

As an initial matter, we reject the defendants' request for a heightened standard of *de novo* review as to their evidentiary challenges. While the Fifth and

---

[50] *Ng Lap Seng*, 934 F.3d at 135.

[51] *See United States v. Skelos*, 988 F.3d 645, 662 (2d Cir. 2021).

[52] *Id.*

[53] *Gatto*, 986 F.3d at 117 (quoting *United States v. White*, 692 F.3d 235, 244 (2d Cir. 2012)).

[54] *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 385 (2d Cir. 2006) (quoting *Schering Corp. v. Pfizer, Inc.,* 189 F.3d 218, 224 (2d Cir. 1999)).

Sixth Amendments guarantee the right to present a defense,[55] the defendants nevertheless must, "[i]n the exercise of this right, . . . comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."[56] "Restrictions on presenting evidence do not offend the Constitution if they serve 'legitimate interests in the criminal trial process' and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'"[57] Thus, when a district court restricts evidence based on a legitimate application of the Federal Rules of Evidence, abuse of discretion remains the proper standard for our review, and we will afford the district court the customary "wide latitude to exclude irrelevant, repetitive, or cumulative evidence."[58]

---

[55] *See United States v. Stewart*, 433 F.3d 273, 310 (2d Cir. 2006).

[56] *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see also Stewart*, 433 F.3d at 311 ("It is . . . well-settled that the right is subject to the application of procedural and evidentiary rules.").

[57] *Stewart*, 433 F.3d at 311 (quoting *Rock v. Arkansas*, 483 U.S. 44, 55–56 (1987)).

[58] *United States v. Holmes*, 44 F.3d 1150, 1157 (2d Cir. 1995) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

**A. The district court did not abuse its discretion in excluding testimony about Code's order, "Do not accept money from these people."**

Code sought to call Blondell Tutwiler and Warren Broughton as defense witnesses to testify to overhearing Code, on separate occasions, speaking on the telephone and telling his interlocutor: "Do not accept money from these people."[59] He now faults the district court for excluding this testimony on hearsay and relevancy grounds.

The hearsay ruling was error. Hearsay is an "out-of-court 'assertion' that is 'offered to prove the truth of the matter asserted in the statement.'"[60] The statement "[d]o not accept money from these people" was an order, *i.e.*, an imperative rather than a declarative statement, and it was offered not for its truth, but for the fact that it was said. It was therefore not hearsay.[61]

---

[59] Doc. 226 at 1, Dkt. No. 17-684.

[60] *United States v. Coplan*, 703 F.3d 46, 84 (2d Cir. 2012) (internal alterations omitted) (quoting Fed. R. Evid. 801(a), (c)).

[61] *See United States v. Bellomo*, 176 F.3d 580, 586 (1999) ("Statements offered as evidence of commands . . . rather than for the truth of the matter asserted therein, are not hearsay.").

However, the district court did not abuse its discretion in excluding the statement on relevancy grounds. Rule 402 of the Federal Rules of Evidence provides, as a foundational matter, that evidence is admissible only if it is relevant. Rule 104(b) further provides: "When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later." "In determining whether [a party] has introduced sufficient evidence to meet Rule 104(b), . . . [t]he court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence."[62]

The relevance of Code's statement, "[d]o not accept money from these people," is conditioned on other facts, namely to whom Code was speaking and whom he meant by "these people." According to Code, he was talking to the coaches he sent to Las Vegas to meet with members of LOYD, and he was ordering them not to take money at the meetings. To prove this, Code sought to introduce

---

[62] *Huddleston v. United States*, 485 U.S. 681, 690 (1988).

evidence that the dates of the phone calls coincided with the dates of the Las Vegas meetings where Dawkins bribed certain coaches. Code also proffered that the witnesses overheard him discussing meeting times and room numbers during one call. However, the proffered testimony was hazy about timing, indicating only that the phone calls occurred "in the weeks immediately preceding" the Las Vegas meeting. Further, Code did not proffer that these witnesses could have testified about who was on the other end of these phone calls, or to whom Code was referring when he said "these people." Faced with such a meager proffer, the district court did not abuse its discretion in excluding testimony about these calls as irrelevant.

**B. The district court did not abuse its discretion in refusing to admit testimony regarding Code's explanation of his agreement with LOYD.**

Code also sought to offer Broughton's testimony that, sometime after overhearing Code on the phone, Code told Broughton that LOYD was paying him a consulting fee to arrange meetings with various coaches. Code argued that this testimony was admissible pursuant to the "state of mind" exception to the rule

against hearsay[63] because he was offering it to demonstrate his understanding of his relationship with LOYD; he was not offering the statement as evidence of the actual nature of his relationship with LOYD. The district court was not persuaded, nor are we.

Rule 803(3) provides a hearsay exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)." This exception specifically excludes "a statement of memory or belief to prove the fact remembered or believed."[64] That exclusion "is necessary to prevent the exception from swallowing the hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind."[65]

Broughton's proffered testimony did not reflect Code's state of mind within the meaning of Rule 803(3). Rather, Code's statement regarding his relationship

---

[63] *See* Fed. R. Evid. 803(3).

[64] Fed. R. Evid. 803(3).

[65] *United States v. Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991).

with LOYD was an assertion of fact—that is, an archetypal hearsay statement—not a statement of motive or intent. In sum, the district court acted well within its discretion in excluding this testimony.

### C. The district court did not abuse its discretion in refusing to admit portions of Code's recorded phone call with Munish Sood.

Code also sought to introduce a portion of a recorded August 8, 2017, phone call between Code and Munish Sood. On the recording, Code recounted a previous conversation with Dawkins; he told Sood: "[I] said, Christian, look . . . You're not paying my guys."[66] The district court granted the Government's motion to preclude the recording as hearsay, finding that these statements also did not fall into the state of mind exception because "Mr. Code is recalling a past statement that he made and offering the fact that he made the statement for its truth."[67] The district court was correct.

---

[66] Tr. at 1087.

[67] Tr. at 809–10.

### 1. The district court properly excluded this phone call as hearsay.

"[A]n expression of state of mind on one occasion may be relevant to state of mind at a later time where the statement reflects 'a continuous mental process,'"[68] but "[w]hether a statement is part of a continuous mental process and therefore admissible under the present state of mind exception is necessarily a question for the trial court."[69] We agree with the district court that Code's August 8, 2017, statement was not admissible to show his state of mind as of the time of the Las Vegas meetings. To the contrary, it was simply hearsay layered on hearsay—that is, an assertion of fact regarding an earlier assertion of fact. The most recent layer was the recorded call, when Code asserted that he had previously made a particular statement to Dawkins; the older layer was Code's earlier assertion of a purportedly true fact (that Dawkins was not paying Code's

---

[68] *United States v. Farhane*, 634 F.3d 127, 172 (2d Cir. 2011) (Raggi, *J.*, concurring) (quoting *Cardascia*, 951 F.2d at 488).

[69] *Cardascia*, 951 F.2d at 488.

"guys").[70] The district court correctly concluded that these layered statements did not demonstrate a state of mind and, therefore, did not abuse its discretion in refusing to admit the phone call.

### 2. The district court did not abuse its discretion in refusing to admit the phone call under Rule 807.

Insofar as the district court also rejected Code's subsequent request to admit the phone call under the residual hearsay exception found in Rule 807, we identify no abuse of discretion.

Rule 807 permits a hearsay statement to be admitted into evidence if it is (1) "supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement," and (2) "more probative on the point for which it is

---

[70] Even if we were to construe Code's remembered statement to Dawkins as an order to Dawkins not to pay Code's "guys," that does not change the analysis of Code's statement on the recorded call; that assertion of fact cannot be read as a statement of Code's then-existing state of mind regardless of whether it was layered on top of another assertion of fact or an order. Code offered the statement in the recorded call "to prove the fact remembered or believed," which is hearsay. Fed. R. Evid. 803(3). Whether the fact remembered or believed was that Dawkins was not paying Code's guys or that Code ordered Dawkins not to pay his guys, Code's statement on the call was inadmissible.

offered than any other evidence that the proponent can obtain through reasonable efforts."[71] In *United States v. Bryce*, we explained:

> [Rule 807] permits admission of hearsay if (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party.[72]

As to the first prong, we found in *Bryce* that the defendant's statements were sufficiently trustworthy when obtained via covert wiretap and against the declarant's penal interest.[73] Code's statement was obtained by wiretap, but it was not against his penal interest—in fact, it was self-serving. A few weeks before the call, Code and Sood entered a consulting agreement with Sood agreeing to pay Code a fee for referring professional basketball players to Sood's financial advisory business. Code, therefore, had an incentive to convince Sood of his ability to refer business to Sood without relying on bribing coaches. Code's statements on

---

[71] Fed. R. Evid. 807(a).

[72] 208 F.3d 346, 350–51 (2d Cir. 1999).

[73] *See id.* at 351.

the call are thus not accompanied by sufficient guarantees of trustworthiness as required by Rule 807.

As to the third prong, the phone call was not "the most probative evidence addressing"[74] the fact at issue because Dawkins testified at trial that Code had instructed him not to introduce one of their partners to any coaches who would accept bribes. Code, therefore, had a factual basis to argue that he instructed Dawkins not to bribe coaches, even without admitting the phone call. Because the recorded phone call did not meet the first or third prong of the *Bryce* test, the district court acted within its discretion in excluding it.

### D. The district court properly excluded evidence of Dawkins's prior good acts.

Dawkins sought to call then-University of Arizona head basketball coach Sean Miller and Louisiana State University head basketball coach Will Wade as witnesses to prove that Dawkins had "relationships with much more powerful coaches than the assistant coaches he was charged with bribing, and that he made

---

[74] *Bryce*, 208 F.3d at 350.

no attempt whatsoever to bribe the more influential coaches."[75] Dawkins argues that this evidence tends show that he lacked specific intent to commit the charged offenses.

The district court did not abuse its discretion in refusing to allow testimony regarding Dawkins's relationships with coaches whom he did not bribe. Federal Rule of Evidence 404(b)(1) provides that, with certain exceptions not relevant here, "[e]vidence of any . . . crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." More to the point here, "[a] defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions."[76] No less than evidence of a defendant's prior "bad acts" used to show that he committed the crime charged, such "good acts" evidence is only relevant if we assume that a defendant acted in conformity with those prior good

---

[75] Appellants' Br. at 72.

[76] *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990).

acts—*i.e.*, if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit.[77]

In urging otherwise, Dawkins offers three unconvincing theories. First, he argues that it would not have made sense for him to bribe assistant coaches, because "the head coach would have been the logically more influential person to bribe."[78] But that is just a variant of "good acts" evidence—like arguing that someone must not have robbed a small bank because he once passed up an opportunity to rob a bigger bank. And in any event, Dawkins himself explained (in a recorded call) why it made perfect sense to bribe only assistant coaches: head coaches are already "making too much money, and it's too risky."[79]

---

[77] *See United States v. Bendetto*, 571 F.2d 1246, 1249–50 (2d Cir. 1978) ("[C]haracter evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts." (citing *Michelson v. United States*, 335 U.S. 469, 477 (1948)); *see also United States v. O'Connor*, 580 F.2d 38, 43 (2d Cir. 1978) (affirming district court's exclusion of testimony that the defendant had not accepted bribes on previous occasions "because such testimony would in effect be an attempt to demonstrate [the defendant's] good character by proof of specific good acts").

[78] Appellants' Br. at 74.

[79] Tr. at 1473.

Second, Dawkins argues that because he had pre-existing relationships with head coaches, he already had access to players and, therefore, lacked a motive to bribe lower-level coaches for access he already possessed. Dawkins forfeited this argument by failing to raise it before the district court, but in any event it is unpersuasive. There was no evidence that Dawkins had ever obtained any clients of his own, much less through head coaches.

Third, Dawkins contends that he needed to call Miller to rebut evidence suggesting that Dawkins wanted to bribe Miller. This final argument is both forfeited (because it was not presented to the district court) and meritless (because Miller could not have refuted the proposition that Dawkins had an unexecuted intention to bribe him).

Accordingly, the district court did not abuse its discretion in refusing to allow Dawkins to call those witnesses.[80]

---

[80] Dawkins and Code also challenge the district court's denial of their request to call the undercover FBI agent to testify about potential misconduct by another agent during the investigation. We agree with the district court that this proffered testimony would not have related in any way to their guilt or innocence, nor would it have been probative of the trustworthiness of any witnesses called at trial.

### E. The district court did not abuse its discretion in admitting testimony of witnesses' understandings of conversations with Dawkins and Code.

Throughout trial, the Government played audio and video recordings of conversations among Dawkins, Code, Blazer, and Sood. The defendants now fault the district court for permitting Blazer and Sood to testify, over objection, regarding their understanding of the conversations with Dawkins and Code in which they took part.

A lay witness's testimony must be "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge." [81] The rational-basis requirement "is the familiar requirement of first-hand knowledge or observation." [82] The helpfulness

---

[81] Fed. R. Evid. 701.

[82] *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (quoting Fed. R. Evid. 701 Advisory Committee Note on 1972 Proposed Rules).

requirement "is designed to provide 'assurance[] against the admission of opinions which would merely tell the jury what result to reach.'"[83]

The district court did not abuse its discretion in permitting Blazer and Sood to testify regarding their understanding of conversations with Dawkins and Code. Blazer's and Sood's testimony was "rationally based on [their] perception[s]."[84] They were participants in these conversations and therefore possessed the required first-hand knowledge of their context—knowledge that would not have been readily available to jurors on their own.[85] As the district court noted, the conversations included jargon that was "not so well known to folks outside of that industry,"[86] an industry in which Blazer had worked for over a decade, and

---

[83] *Id.* (quoting Fed. R. Evid. 704 Advisory Committee Note on 1972 Proposed Rules (alteration in original)).

[84] Fed. R. Evid. 701.

[85] *See United States v. Garcia*, 413 F.3d 201, 212 (2d Cir. 2005) ("Rule 701 affords the jury an insight into an event that was uniquely available to an eyewitness. In this respect, the rule recognizes the common sense behind the saying that, sometimes, 'you had to be there.'").

[86] Tr. at 384.

therefore the testimony was "helpful to clearly understanding" [87] the often-confusing recorded conversations.

## VI. The district court made no reversible errors in providing the challenged jury instructions.

Dawkins and Code raise a number of challenges to the district court's jury instructions, claiming there was error in providing "false exculpatory" and "conscious avoidance" instructions and in failing to provide "adverse inference" and "multiple conspiracy" instructions. We review each of these challenges *de novo*, applying a harmless error standard.[88]

### A. Providing a false exculpatory instruction was harmless error.

Providing the false exculpatory instruction was error, but harmless. At trial, the Government questioned Dawkins about two recorded phone conversations. In the first call, Code was heard telling Dawkins: "We're just gonna take these fools'

---

[87] Fed. R. Evid. 701.

[88] *See United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) ("If the defendant objected to an erroneous jury instruction at trial and raises the same claim of error on appeal, a harmless error standard of review applies."); Fed R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

money."[89] Dawkins testified that he understood that statement to mean that Dawkins and Code would not introduce D'Angelo to coaches who were willing to accept money. In the second call, Dawkins was heard telling D'Angelo, "I don't want you to go down that path."[90] Dawkins testified that this statement was made to convince D'Angelo not to pursue paying coaches.

Prior to Dawkins's testimony, the Government advised the district court that it was not planning to request a false exculpatory charge. After Dawkins testified, however, the Government sought such an instruction, and, over defense objection, the court charged the jury:

> Now, you've heard testimony that a defendant made a statement in which he claimed that his conduct was consistent with innocence and not with guilt. The government claims that these statements in which the defendant attempted to exculpate himself are false. If you find that the defendant gave a false statement in order to divert suspicion from himself, you may infer that the defendant believed that he was guilty. You may not, however, infer on the basis of this alone that the defendant is, in fact, guilty of the crimes for which he is charged. Whether or not the evidence as to a defendant's statements shows that the defendant believed he was guilty and significance, if any, to be

---

[89] Tr. at 1294.

[90] Tr. at 1278.

attached to any such evidence, are matters for you, the jury, to decide.[91]

Instructing the jury that false exculpatory statements can evidence consciousness of guilt is appropriate when the Government presents a substantial factual predicate at trial showing that the defendant made false statements in an effort to appear innocent.[92] The instruction is most often (though not only) given when a defendant made false pretrial statements to law enforcement officers,[93] and in any event it is typically limited to a defendant's pretrial statements.[94]

But here, Dawkins's recorded calls were not exculpatory at all. To the contrary, they were entirely consistent with the Government's theory of the case, which was that the defendants wanted to be strategic about which coaches to pay.

---

[91] Tr. at 1672.

[92] *See, e.g.*, *United States. v. Strother*, 49 F.3d 869, 876–77 (2d Cir. 1995).

[93] *See, e.g.*, *id.* (approving instruction where defendant made false exculpatory statements to "bank officials and federal authorities"); *United States. v. Durrani*, 835 F.2d 410, 424 (2d Cir. 1987) ("False exculpatory statements made to law enforcement officials are circumstantial evidence and have independent probative force."); *United States v. Parness*, 503 F.2d 430, 438 (2d Cir. 1974) (considering false exculpatory statements before grand jury as "circumstantial evidence of guilty consciousness [that] have independent probative force").

[94] *See* 1 L. SAND, ET AL., MODERN FEDERAL JURY INSTRUCTIONS-CRIMINAL § 6.05 (2007).

Moreover, Dawkins was talking with his co-conspirators (and an undercover agent he thought was on board). The Government offers no reason to think that, during these particular calls while the conspiracy was allegedly in full swing, Dawkins was trying to lead his co-conspirators astray. Moreover, because Dawkins was unaware the calls were being recorded, there is no reason to think Dawkins was trying to deceive any third parties who might have been listening in.

The Government's quarrel is not with Dawkins's recorded statements so much as his interpretation of them during his trial testimony. But we have never held that a defendant's trial testimony can prompt a false exculpatory instruction. When defendants testify, it is for the jury to decide whether to accept or reject their testimony, in whole or in part. In these circumstances, there was no reason to give the jury a special false exculpatory instruction merely because, at trial, the

defendant offered an innocent explanation of his own prior statements that the Government disputed.

This error, however, did not affect Dawkins's and Code's substantial rights. The Government presented ample evidence of their guilt beyond Dawkins's testimony explaining the two phone calls, such as the recorded phone calls between Dawkins, Code, Blazer, and Sood, and the testimony of Blazer and Sood. Further, the district court instructed the jury that Dawkins's testimony should be "examine[d] and evaluate[d] . . . just as you would the testimony of any witness"[95] and that guilt could not be inferred solely from a false exculpatory statement. These instructions rendered harmless any error in the false exculpatory instruction.[96]

---

[95] Tr. at 1661.

[96] *See United States v. Clark*, 45 F.3d 1247, 1251 (8th Cir. 1995) ("[T]he court instructed the jury that [the defendant's] trial testimony should be judged in the same fashion as that of other witnesses, so there was at most harmless error.").

## B. The district court did not err in providing a conscious avoidance instruction.

Over Code's objection, the district court provided a standard conscious avoidance charge to the jury, based in part on Code's statements during a recorded conversation. As the defendants' joint brief challenges this instruction only as to Code, we consider any error solely with respect to him.

"The doctrine of conscious avoidance (*i.e.*, 'willful blindness') prevents defendants from avoiding criminal liability by 'deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances' and that, if known, would render them guilty of a crime."[97] A conscious avoidance instruction is appropriate when a defendant claims to lack the knowledge necessary for a conviction, and the evidence presented at trial would permit a reasonable jury to conclude that the defendant was "aware of a

---

[97] *Gatto*, 986 F.3d at 122 (quoting *Glob. Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)).

high probability [of the fact in dispute] and consciously avoided confirming that fact."[98]

A conscious avoidance instruction was warranted in this case. Code placed his knowledge squarely in dispute by asserting that he was unaware that Dawkins was paying bribes to coaches. Moreover, the Government provided an ample factual predicate for the conscious avoidance charge. Specifically, it introduced evidence of a phone call between Dawkins and Code where the two discussed a meeting wherein Dawkins believed a coach received a $5,000 bribe. Code told Dawkins that he had spoken to the coach shortly after that meeting, but "we didn't discuss numbers, because I'm not even sure if he wanted me to know. . . . But he would have told me if I'd have asked, but I didn't ask."[99] This suggested that Code deliberately avoided learning the truth from the coach. Further, the Government introduced evidence that Code told Dawkins they should protect themselves by being paid only in cash. These "red flags" serve as evidence that Code wanted to

---

[98] *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000) (alteration in original) (quoting *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993)).

[99] Government's Suppl. App'x at 42–43.

conduct their activities so as to avoid detection, and that he was aware his dealings

with Dawkins and other co-conspirators were illegitimate.[100]

### C. The district court did not err in refusing to provide an adverse inference instruction.

Dawkins and Code requested an adverse inference instruction on the basis

that one of the Government's "key witnesses," undercover agent D'Angelo, was

unavailable to them. Initially, Dawkins and Code sought to call D'Angelo to testify

regarding alleged FBI misconduct, but after the district court precluded this

testimony as irrelevant, they sought an instruction permitting the jury to infer

from the Government's failure to call D'Angelo that the agent's testimony would

have been adverse to the Government's case. The district court declined to provide

an adverse inference instruction and instead instructed the jury:

> There are several persons whose names you may have heard during
> the course of the trial but did not appear to testify. I instruct you that
> each party has an equal opportunity, or lack of opportunity, to call
> any of these witnesses. Therefore, you should not draw any inferences
> or reach any conclusions as to what they would have testified to had
> they been called. Their absence should not affect your judgment in

---

[100] *See United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance.").

any way. You should, however, remember my instruction that the law does not impose on a defendant in a criminal case, the burden or duty of calling any witness or producing any testimony.[101]

The district court did not err in giving the quoted instruction or in refusing to provide an adverse inference instruction. An adverse inference instruction is appropriate "[w]hen 'a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction' and fails to produce such witnesses."[102] In such a case, "the jury may infer that 'the testimony, if produced, would be unfavorable' to that party."[103] Here, the district court correctly denied the defendants' request to call D'Angelo to testify about potential misconduct by another agent during the investigation.[104] But if the defendants had wanted to call D'Angelo to testify about his meetings with the defendants, or for some other permissible purpose, they clearly could have done so. This case,

---

[101] Tr. at 1661.

[102] *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988) (quoting *Graves v. United States*, 150 U.S. 118, 121 (1893)).

[103] *Id*. (quoting *Graves*, 150 U.S. at 121).

[104] *See supra* note 80 (holding that testimony about misconduct was properly excluded).

therefore, falls within the situation we described in *United States v. Caccia*: "where a witness is equally available to both sides, but is not called by either side . . . the court has discretion to (1) give no instruction and leave the entire subject to summations, (2) instruct the jury that no unfavorable inference may be drawn against either side, or (3) instruct the jury that an adverse inference may be drawn against either or both sides."[105] The district court's choice of the second option fell within its broad discretion.

### D. The district court did not err in refusing to provide a multiple conspiracy instruction.

Code requested a multiple conspiracy instruction, arguing that the evidence "seem[ed] to demonstrate different agreements with different sort[s] of goals of working together."[106] The district court refused to provide this instruction and, instead, charged the jury that the object of the single conspiracy at issue was "paying bribes or illegal gratuities to men's college basketball coaches intending

---

[105] *United States v. Caccia*, 122 F.3d 136, 139 (2d Cir. 1997) (internal citations omitted).

[106] Tr. at 1407.

to influence and reward those coaches in connection with the business of their respective universities."[107]

The district court did not err in refusing to give a multiple conspiracy instruction. Such a charge is appropriate when "the evidence shows separate networks operating independently of each other,"[108] but it is not warranted when the evidence shows "that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal."[109] Though the jury heard evidence of several conversations among differing groups of people, those conversations did not constitute "separate networks operating independently of each other"[110] and could not be considered distinct conspiracies. Therefore, the district court did not err in refusing to instruct the jury on multiple conspiracies.

---

[107] Tr. at 1618.

[108] *United States v. Barlin*, 686 F.2d 81, 89 (2d Cir. 1982).

[109] *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990) (quoting *United States v. Martino*, 664 F.2d 860, 876 (2d Cir. 1981)).

[110] *Barlin*, 686 F.2d at 89.

## VII. Conclusion

In sum, we hold as follows:

1. The district court properly denied the motion to dismiss. The indictment was sufficient on its face, and the district court properly declined to consider, before trial, whether the Government would be able to prove the defendants' guilt based on the factual allegations in the indictment.

2. To prove a violation of § 666(a)(2), the Government need not prove a nexus between the agent to be influenced or rewarded and the federal funding that the organization receives. Specifically, the Government need not prove that the agent had any control over the federal funding received by the organization, or that the agent worked in a program, within the organization, that used those federal dollars. Accordingly:

   a. The district court's jury instruction, which did not so limit the definition of "agent," was not erroneous.

   b. The Government presented sufficient evidence that the coaches, as university employees, were "agents" of their universities.

3. For purposes of § 666(a)(2), the phrase "business or transaction" is not limited to commercial activities of the federally funded organization but includes noncommercial activities as well. Accordingly:

    a. The district court's jury instruction that the "business" involved in this case was "the operation and administration of the university's men's basketball program" was not erroneous.

    b. The Government presented sufficient evidence that the bribery scheme was in connection with the business of the universities.

4. Section 666(a)(2) was constitutional as interpreted and applied to the defendants.

5. The district court did not abuse its discretion in making any of the challenged evidentiary rulings.

6. Although the district court erred in providing a false exculpatory instruction to the jury, the error was harmless. The defendants' remaining challenges to the jury instructions lack merit.

We therefore **AFFIRM** the district court's October 22, 2019, judgments of conviction.